### KRAMER v. LYLE et al.

(District Court, N. D. Georgia.   June 6, 1912.)

No. 15, In Equity.

1. WILLS (§ 571*)—CONSTRUCTION OF BEQUEST—LIFE INSURANCE.
   A bequest by a testator to his wife of "the sum of ten thousand dollars to be realized out of the proceeds of such life insurance as may be of force on my life at the time of my death" includes policies in which the wife was named as beneficiary, and she is required to account for the proceeds of such policies as a part of the bequest.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 1244; Dec. Dig. § 571.*]

2. WILLS (§ 761*)—ADVANCEMENTS—EVIDENCE.
   Under Civ. Code Ga. 1910, § 4053, which provides that "a memorandum of advancements, in the handwriting of the parent, or subscribed by him, shall be evidence of the fact of advancement, but shall not be conclusive as to the valuation of the property, unless inserted as part of the testator's will or referred to therein," advancements are sufficiently proved by indorsements on the back of a will in the testator's handwriting, made pursuant to a provision therefor in the will.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1968, 1969; Dec. Dig. § 761.*]

3. WILLS (§ 560*)—CONSTRUCTION—DESCRIPTION OF PROPERTY.
   A will devised to the wife of the testator certain real estate specifically described, and also "all lands, wherever situated, of which I may die seised and possessed, which said lands have been sold by me and bond for titles given to the purchasers and the purchase money or any part thereof due me at the time of my death; my purpose being to convey such purchase-money notes to my said wife together with the security I might hold therefor. * * *" It also devised to a son "all real estate of which I may die seised and possessed situated in the city of Carrollton" not disposed of to testator's wife. After the execution of the will, testator signed and delivered to another a paper reciting that he had sold to such other certain described real estate in Carrollton, stating the terms, and that the papers were to be executed on a date given, which was after the time of his death. Held, that such real estate did not pass under the provision to the wife, but to the son, as real estate of which the testator was seised and possessed at the time of his death and which he had not disposed of.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1216–1220; Dec. Dig. § 560.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. WILLS (§ 560*)—CONSTRUCTION—DESCRIPTION OF PROPERTY.

Under the same will, which bore intrinsic evidence of the intention of the testator to divide his property equally between his wife and son so far as it could be done in kind, real estate in the city of Carrollton not specifically devised to his wife, owned by him at the time of its execution, but which he afterward contracted to sell, giving a bond for title and taking notes for the purchase money, passed to the son, together with the notes; the provision in favor of the wife as to that class of property being limited to real estate which the testator had contracted to sell prior to the execution of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1216–1220; Dec. Dig. § 560.*]

In Equity. Suit by Earnest W. Kramer against Charles A. Lyle and Ruth Kramer. On bill and answer. Final decree.

Watkins & Latimer, of Atlanta, Ga. (Edgar Watkins, of Atlanta. Ga., of counsel), for complainant.

Dorsey, Brewster, Howell & Heyman, of Atlanta, Ga., and S. Holderness, and J. O. Newell, both of Carrollton, Ga., for defendants.

NEWMAN, District Judge. This case is now before the court on bill and answer, and involves the construction of the following will:

"State of Georgia, Carroll County.

"I, E. G. Kramer, of said state and county, being of sound and disposing mind and memory, do make this my last will and testament, by it revoking all others previously made.

"Item 1. I will and bequeath unto my beloved wife, Ruth, the following described property, to wit: My home place, situated on the south side of South street, in the city of Carrollton, said state and county. Said place containing twenty-two acres of land more or less. Also all furniture, furnishings, and household goods of every kind, character and description, that might be in said house at the time of my decease, including books, prints, pictures, bric-a-brac, silver and gold plate, wearing apparel, ornaments, also such provisions, cooking utensils, kitchen and dining room furniture as may be in said residence at the time of my decease. Also all horses, mules, cattle, swine, buggies, wagons, carriages, harness, farming implements, garden implements and other things that might be on said place at the time of my decease. Also that lot in said city of Carrollton, said county, situated on the north side of said South street, bounded on the north by the Central of Georgia Railway right of way, on the east by a lot owned by said railway, on south by said South street and on the west by an alley which runs between said property and what is known as the 'Marchman place.' Also a lot on the south side of said South street in said city and county, fronting said street one hundred feet and running back same width, south, five hundred feet, bounded on the east by the 'Meadows place,' now in possession of Fillilove. Also two hundred shares of the capital stock of the Mandeville Mills, a corporation of said state and county, said stock being of the par value of one hundred dollars per share. Also one hundred shares of the capital stock of the First National Bank of Carrollton, a banking corporation of said county, said stock being of the par value of one hundred dollars per share. Also the sum of ten thousand dollars to be realized out of the proceeds of such life insurance as may be of force on my life at the time of my death. Also all notes, accounts, and judgments that might be owing to me at the time of my death, together with all lands, wherever situated, of which I may die seised and possessed, which said lands have been sold by me and bond for titles given to the purchasers and the purchase money or any part thereof due me at the time of my death; my purpose being to convey such purchase-money notes to my said wife together with the security I might hold therefor and give her full power and authority to execute to the purchaser deeds in accordance with such bonds as I may have given, in case

of payments to her, or in case she elects to sue, to give her full authority either to bring suit for the land, or to sue upon the purchase money, notes and execute to the purchaser and have same recorded in the office of the clerk of the superior court, where the land may lie, a deed, for the purpose of levy and sale, as per the requirements of the law in such cases made and provided.

"Item 2. I will and bequeath unto my beloved wife, Ruth, in addition to what is bequeathed here in item one, the sum of five thousand dollars, which is expressly in lieu of years support, in case she accepts this legacy in lieu of years support, she will make it known in writing to the executor of this my last will and testament within ninety days of the date of his qualification.

"Item 3. I will and bequeath to my son, Earnest, the following described property, to wit: All real estate of which I may die seised and possessed, situated in the city of Carrollton, not disposed of in item one of this my last will and testament. Also two hundred shares of the capital stock of the Mandeville Mills, a corporation of said state and county, said stock being of the par value of one hundred dollars per share. Also one hundred shares of the capital stock of the First National Bank of Carrollton, a banking corporation of said county, said stock being of the par value of one hundred dollars per share.

"Item 4. It is my will that the residue of my estate be divided equally between my wife, Ruth, and my son, Earnest, share and share alike. My said son, Earnest, to account for all advancement that I may make him after this date, which are charged to him on the back of this my last will and testament.

"Item 5. I nominate and appoint my friend, C. A. Lyle, executor of this my last will and testament. My executor shall not be required to make returns to any court, except, when my estate shall have been fully administered, he shall file with the ordinary a report showing all receipts and disbursements on account of my said estate. My executor will give bond, conditioned for the faithful performance of his trust, in the sum of fifty thousand dollars; said bond to be made by a bond or surety company, engaged in such business in the state of Georgia, and whose financial standing has been approved by the proper authorities of said state of Georgia: the premium on said bond to be paid out of my estate at the expense of my said estate."

This will was properly executed.

The contest is between the son of the testator and his stepmother, the widow of the deceased.

The important question in this case, as in all cases of like character, is to arrive at the intention of the testator. His general intention is perfectly manifest, and that is to divide his property equally between his son and his wife, or as near as could be consistently with his desire to give them each separate pieces of property.

[1] The first provision of the will over which there is a contest is the language in item 1, in which he provides for his wife, Ruth, in the following language:

"Also the sum of ten thousand dollars to be realized out of the proceeds of such life insurance as may be of force on my life at the time of my death."

At the time of the death of the testator there was in force on his life more than $10,000 of insurance. A part of this was insurance in the Royal Arcanum, and the beneficiary named in this policy was the wife, Ruth Kramer, and after her husband's death she collected on this policy the sum of $2,630.49. The contest between the parties is as to whether this sum should be charged to her as a part of the $10,000 insurance money given her by the will; that is, whether a policy payable to her should be considered as a part of the insurance

which the testator had in mind and which was included in the language in the will referred to as insurance on the testator's life. The language is "such life insurance as may be of force on my life at the time of my death." This Royal Arcanum policy was as much insurance on the life of Mr. Kramer as was the larger amount payable to his estate, and it seems to me perfectly clear that his intention was to embrace this in the insurance on his life referred to by Mr. Kramer.

The most pertinent authority on this question is the case of Beermann et al. v. De Give, Executor, et al., 112 Ga. 614, 37 S. E. 883. In that case the will gave to the wife "ten thousand dollars ($10,000.00) life insurance carried by me, or that sum hereafter carried by me." Beermann, the testator, left, at the time of his death, a policy of life insurance for $10,000 in which his wife and son were named as equal beneficiaries. The wife, after receiving her half of this policy, or $5,000, claimed $10,000 additional under the terms of the will. Construing this will, the Supreme Court, in the case referred to (112 Ga. on page 616, 37 S. E. on page 884), said this:

"Looking to the whole will for the intention of the testator, it is clear that his purpose was to give his wife $10,000 in addition to one-fifth of the residuum of his estate. It is equally certain that he was under the impression that he had the right to make a testamentary disposition of the proceeds of an insurance policy on his life, and upon which he paid the premiums, although it was not payable to his legal representative, and in making his will that he intended to deal with any such policy that might exist then or at the time of his death, as his property. This will shows that it was his desire that his wife should have $10,000 of insurance money, and, 'in its absence,' that a like amount should be paid to her by his executor from other sources. It is therefore our opinion that, in order to carry out the testamentary scheme, the $5,000 paid to Mrs. Beermann upon the life insurance policy should be treated as a part of the testator's estate, and that the executor should pay her, from the general funds of the estate, an additional sum of $5,000, thus enabling her to obtain the $10,000 legacy which the testator obviously intended that she should receive."

This case, it seems to me, being a Georgia case, construing a Georgia will, would be controlling; but independently of this I think it clear that in the present case the meaning of the testator was that his wife should have, by this bequest, $10,000 out of all the insurance on his life, embracing this Royal Arcanum policy, the result of which is that she should account to the executor for the $2,630.49 as a part of the $10,000 bequeathed to her in this clause of item 1.

[2] The next contest is over this language in item 4:

"My said son, Earnest, to account for all advancements that I may make him after this date, which are charged to him on the back of this my last will and testament."

At the time of the death of the testator the following indorsements were made on the back of the will:

"I, this day charge my son Earnest, an advancement of five thousand dollars as per item 4 of my will. February 19th, 1910.

"[Signed] E. G. Kramer.

"I, this day charge my son Earnest, an advancement of five thousand dollars as per item 4, of my will. March 4th, 1910.

"[Signed] E. G. Kramer.

"I, this day charge my son Earnest, an advancement of one thousand dollars as per item 4 of my will.          [Signed] E. G. Kramer."

No question was made in the argument that these indorsements of advancements on the back of the will were in the handwriting of the testator.

No contest is made in the bill that the last item of $1,000 should not be rightly charged as an advancement; but it is claimed that the first two items of $5,000 each, or $10,000, were given by the testator to his son under a contract and agreement between them. It is alleged that the son was living in Georgia in 1909, when his father proposed to marry again, and he did not wish his son to remain with him after he was married, so that the father agreed to give the son the proceeds of certain stocks, amounting to $10,000, upon his return to Texas, from which state he had not long before returned to Georgia. All of this, so far as it relates to any contract or agreement between father and son, is expressly denied in the answer and cannot be taken as true in the case.

It is insisted further, in reference to this particular item, that an advancement made after the date of the will and indicated to be such in writing, but not properly attested as a codicil to the will, cannot be charged as an advancement. Section 4052 of the Code of Georgia is as follows:

"Advancements. An advancement is any provision by a parent made to and accepted by a child out of his estate, either in money or property, during his life time, over and above the obligation of the parent for maintenance and education. Donations from affection, and not made with a view of settlement, not intended as advancements, shall not be accounted for as such; nor shall the support of a child under the paternal roof, although past majority, nor the expenses of education, be held as advancements, unless charged as such by the parent."

What is necessary to prove advancements is stated in section 4053 of the Code, which is as follows:

"Proof of Advancements. A memorandum of advancements, in the handwriting of the parent, or subscribed by him, shall be evidence of the fact of advancement, but shall not be conclusive as to the valuation of the property, unless inserted as part of testator's will or referred to therein."

I am unable to agree with the argument that these two items should not be charged as advancements, and I think the executor, in distributing the estate, should treat these as advancements made by the testator to his son and to be accounted against him in giving him his share of the estate.

[3] By the third item of his will the testator gave to his son Earnest "all real estate of which I may die seised and possessed, situated in the city of Carrollton, not disposed of in item one of this my last will and testament." One of the pieces of property embraced in this item is what will be called the "Kytle property" because of the transaction hereinafter referred to.

On September 1, 1911, after the execution of the will and before his death, the testator made this paper and delivered the same to S. C. Kytle:

"I, E. G. Kramer, hereby certify that I have sold to S. C. Kytle the store he now occupies and the warehouse adjoining for the sum of $7,000.00, to be paid in fourteen equal annual installments with 8% interest per annum from

Jan. 1, 1912. He agrees to pay for the months of Oct., Nov. and Dec. each $25.00 which amounts are not to be deducted from the purchase money. Papers to be executed Jan. 1, 1912."

The property covered by this paper, being real estate in the city of Carrollton not disposed of in item 1 of the testator's will, it is conceded would have gone to his son, Earnest Kramer, under the will, except for the making of the above paper, taken in connection with the provision of the first item of the will with reference to what was bequeathed to the wife. The language is this:

"Also all notes, accounts, and judgments that might be owing to me at the time of my death, together with all lands, wherever situated, of which I may die seised and possessed, which said lands have been sold by me and bond for titles given to the purchasers and the purchase money or any part thereof due me at the time of my death; my purpose being to convey such purchase-money notes to my said wife together with the security I might hold therefor and give her full power and authority to execute to the purchaser deeds in accordance with such bonds as I may have given, in case of payments to her, or in case she elects to sue, to give her full authority either to bring suit for the land, or to sue upon the purchase money, notes and execute to the purchaser and have same recorded in the office of the clerk of the superior court, where the land may lie, a deed, for the purpose of levy and sale, as per the requirements of the law in such cases made and provided."

It is claimed that, this property having been sold by Kramer to Kytle, this provision of item 1 operates and gives the property, or the proceeds of the sale, to the wife, and not the provision of item 3, which would give it to the son.

The paper made by Kramer to Kytle, whatever it may be, constitutes at most an inchoate and incomplete transaction as between the parties. It may be that it is a unilateral contract, as claimed, and that neither party was bound, a mere nudum pactum; but, whether this be true or not, the title certainly was left in Kramer, and he died seised and possessed of the property. I think it clearly passed to the son, under item 3 of the will.

Some question was raised in the course of the argument of the case as to whether Kytle should not be a party to this proceeding. Counsel have agreed, however, that this question need not be considered, that either party will carry out the trade with Kytle if he so desires, and it appears that he has indicated that such is his desire.

[4] The next and remaining question is as to what is called the "Harris property," in Carrollton. This is real estate in Carrollton not given to his wife, as such, by the first item of the will, and which would have passed, at the time the will was executed, unquestionably to the son Earnest. After the execution of the will the testator sold the property and gave a bond for title and took notes for the purchase money, and the question is whether it goes to Earnest, the son, or to the wife under the language of the first item of the will with reference to notes and accounts for property the testator may have sold.

Again bearing in mind the intention of the testator to make an equal division of his property between his wife and his son, which apparently was his intention so far as he could and at the same time

divide the property in kind, it should appear clearly from the provisions of this will that it was the testator's intention that the sale of this real estate should give the purchase-money notes to the wife instead of to the son. I do not think this intention is clear, or that it can be clearly gathered from the provisions of the will. In my opinion what the testator had in mind was notes and accounts which he had in hand for property then sold. It is true that in item 1, on this subject he used the language "purchase money or any part thereof due me at the time of my death." The way I construe this provision, however, is this: That the testator, not knowing, of course, when he would die, and having probably given bonds for title and received purchase-money notes, was anticipating the fact that part of it or all of it might be paid before his death, and it was simply a reference to this and having this in mind that he said "due me at the time of my death." He still held the title to the land, of course, subject to the bond for title which he had given and to his obligation to convey when the purchase money was paid, and this might bring it within the language of item 3 notwithstanding the language of item 1 with reference to his wife. There is undoubtedly strong ground for contending that there is conflict between the two provisions; but endeavoring to carry out what seems to me to have been the manifest purpose of the testator, to divide both his real estate, his stocks, and his money equally between his wife and his son, I think the proper construction of the will is to give the purchase-money notes from this Harris property, in the hands of the executor, to the son Earnest.

This last matter which I have referred to, as well as certain other provisions of the will which have been construed, are not free from doubt; but I have given it the construction which, in my judgment, is proper.

I have not had time or opportunity to go into a full discussion of the legal questions so ably discussed by counsel on both sides of this case, in oral argument and in their briefs; but I have endeavored to make clear, in this brief way, what my views are on the questions involved.